## IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **EDWARD W. WALTERS III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-590-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Edward W. Walters III ("Walters"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Walters appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Walters was not disabled.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

Walters testified that he had approximately 10 to 15 jobs in 15 years, and that he had been terminated from most of them. (R. 60-62). The two employers where he worked the longest were places where his parents worked and were able to help him. *Id.* He left one job voluntarily because he had been accused of sexual harassment and he had the opportunity to leave for another job. (R. 61). He testified that he had trouble with social skills and with his ability to understand and follow directions. (R. 61-62).

Walters said that he had trouble in his personal relationships as well as in his relationships at work. (R. 63-64). He said that he hadn't gotten out of bed the previous weekend, and he wondered if his family was getting ready to have him committed. (R. 64). Walters lived with his grandmother, and he complained that his efforts to do things she asked did not satisfy her. (R. 64-65). She also gave him multiple requests at one time, and he said that he could not process these requests, but needed to be asked one thing at a time. (R. 65). He had experienced similar problems with employers, and they were not satisfied with his performance and his ability to follow directions. (R. 66-67). He sometimes became upset, defensive, and irritable when employers criticized his performance. (R. 67-68).

Walters sometimes had suicidal thoughts, and at the time of the January 2009 hearing, he testified that he spent about 70 or 80 per cent of his time in his room "zoned out." (R. 68-69).

Walters testified that he had suffered grand mal seizures that were controlled by medication, but he believed that some of his behavior was explained by petit mal seizures, because he would not remember behaving as others told him that he had, or he would "wake up in the backyard." (R. 71-72).

While Walters thought that his mental problems were the primary reason why he couldn't work, he also said that he had a disc problem that limited his ability to lift.  (R. 73).

Walters' mother testified at the January 2009 hearing that Walters lived with his parents when he was a young adult, but there were problems because he had difficulty perceiving others' feelings.  (R. 76).  She described a specific incident when she and Walters visited an employment counselor, and the counselor immediately perceived that Walters' mother was upset.  *Id.*  The counselor asked Walters if he understood that his mother was upset, and Walters said no.  *Id.* Walters' mother described incidents over small household arguments during which Walters' parents felt threatened by him.  (R. 76-77).  She said that in her opinion Walters' inappropriate behavior was not intentional, but was due to an inability to understand the difference between appropriate and inappropriate behavior.  (R. 77-78).  She said that Walters would sometimes become upset about things that did not seem significant to others.  (R. 81-82).

At the October 2009 hearing, Walters testified that a combination of things kept him from working, and inability to focus was one of them.  (R. 28).  Inability to follow directions was a second, and social conflict was a third.  *Id.*  He said that he misinterpreted others' intentions, and he gave a recent example of an incident when he made a woman uncomfortable, and he had not been aware of her discomfort until he was confronted by a third person.  (R. 28-29).  He said that he had been fired from previous jobs in part because of similar situations when he caused conflict with a woman to whom he was attracted.  (R. 30-31).  In some work situations, he had difficulty meeting quotas.  (R. 31).

Walters testified that he would sometimes watch a television show, and right after it was over, he could not describe it.  (R. 32-33).  If he was interrupted while reading a book, he might have to repeat a chapter to remember what happened.  *Id.*

3

At the October 2009 hearing, Walters said that he had been told that he had "a few blackouts" over the past several months.  (R. 33).

Walters' grandmother, Martha Walters, testified at the October 2009 hearing.  (R. 42-47). Walters had been living with her for the previous four years.  (R. 42).  She described an incident during which she heard "thumping" in Walters' room.  (R. 43-44).  When she went in to see what was happening, Walters was stumbling and unresponsive.  (R. 44).  He became "glassy-eyed" and took several minutes before he came "back to consciousness."  *Id.*

Walters' grandmother gave an example of problems giving him directions.  (R. 45).  She said when Walters cooked potatoes, he cooked too many on too hot of a setting, causing the pot to "boil over and mess up the stove."  *Id.*  Even though he had been asked to stop doing this, he always repeated this manner of cooking potatoes.  *Id.*  In describing Walters' difficulties with money, she said that he was once "taken in" by a telemarketer for $398.00.  (R. 45-46).  She said that Walters had difficulties with his memory, and she described a time when she and Walters together bought a padlock for a shed.  (R. 46-47).  A few days later, he didn't remember buying the padlock, and he could not find his key to it.  *Id.*

John E. Cattaneo, M.D. saw Walters for a neurologic consultation regarding his "spells" on October 7, 2003.  (R. 290-91).  Dr. Cattaneo said that it was difficult to tell if recent episodes were caused by epileptic conditions.  (R. 291).  He did not suggest changing medications that appeared to be controlling seizures, and he suggested that sleep apnea could be a contributing factor.  *Id.*  He suggested weight loss.  *Id.*  He also suggested that Walters see a psychiatrist for help with "crying spells."  *Id.*

Walters was seen by David E. Hansen, Ph.D. on December 23, 2004 for a psychological consultation "as an aid to the process of vocational rehabilitation."  (R. 292-96).  Dr. Hansen

described Walters as "somewhat odd and overly casual."  (R. 293).  He was slouched on the

couch, and "he often responded in a somewhat flippant narcissistic fashion."  *Id.*  Dr. Hansen had

to repeat instructions to help Walters understand, and Walters seemed to have a poor attention

span.  *Id.*  Walters' full scale IQ was 77, which was borderline (6th percentile).  *Id.*  His verbal IQ

was in the low average range, and his performance IQ was in the borderline range.  *Id.*  Indices

within the overall IQ test showed deficient results in working memory index and processing

speed index.  (R. 293-94).  In contrast to those results in the deficient range, Walters' expressive

vocabulary and general fund of information were in the average range.  (R. 294).  Dr. Hansen

administered tests that showed that Walters' academic functioning in areas of reading, spelling,

and arithmetic were all in the average or low average range.  *Id.*  Other tests indicated that a

"clinically significant attentional problem exists."  *Id.*

Dr. Hansen said that all of the testing results suggested that Walters might have

Asperger's Disorder, but additional testing would be needed to make a diagnosis.  (R. 295).  He

recommended psychostimulant medication for the attentional difficulties, and he recommended

consideration of an antidepressant.  *Id.*  He recommended interpersonal psychotherapy to help

Walters gain a better understanding of his strengths and weaknesses and to do interpersonal skills

training.  *Id.*  Dr. Hansen said that Walters would perform best in positions that were task-

focused and that he would need direction, support, and encouragement with each step of the

vocational process to overcome his difficulty with initiative and direction.  *Id.*  His diagnoses on

Axis I[1] were learning disorder not otherwise specified (nonverbal learning disability); rule out

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation."  American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text
Revision 4th ed. 2000) (hereinafter "DSM IV").

Asperger's Disorder; and major depression, recurrent, moderate severity.  (R. 296).  On Axis II, he diagnosed borderline intellectual functioning.  *Id.*

Walters saw Michael H. Vu on July 20, 2006 to obtain medications, and he was prescribed Topamax, Nasonex, Asmanex, and Xopenex.  (R. 302-03).

Walters saw a chiropractor several times in October and November 2006.  (R. 306).

Agency consultant Linda R. Craig, Psy. D. conducted a psychological evaluation of Walters on March 22, 2007.  (R. 307-11).  Dr. Craig said that Walters' affect was depressed, and his ability to focus and concentrate appeared compromised.  (R. 307).  Walters was unable to interpret simple proverbs, and his intelligence appeared low-average.  *Id.*  Dr. Craig's impressions on Axis I were major depressive disorder, recurrent, moderate; learning disorder not otherwise specified (nonverbal learning disorder); and attention-deficit/hyperactivity disorder, predominantly inattentive type.  (R. 309).  On Axis II, her impressions were personality disorder not otherwise specified with narcissistic traits; and borderline intellectual functioning "per testing 12/23/04."  *Id.*  She assessed Walters' Global Assessment of Functioning ("GAF")[2] as 55.  *Id.*  In her summary, Dr. Craig said that Walters' "ability to work is severely impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, and socially interacting with coworkers or public."  *Id.*

---

[2] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas."  *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id.*

Agency nonexamining consultant Janice B. Smith, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on April 27, 2007.  (R. 314-31).  For Listing 12.04, Dr. Smith noted Walters' mood disturbance with depressive syndrome.  (R. 317).  For Listing 12.05, Dr. Smith noted Walters' borderline to low average intelligence.  (R. 318).  For Listing 12.08, Dr. Smith noted Walters' inflexible and maladaptive personality traits that cause significant impairment in social or occupational functioning or subjective distress.  (R. 321).  For the "Paragraph B Criteria,"[3] Dr. Smith found that Walters had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 324).  In the "Consultant's Notes" portion of the form, Dr. Smith noted that Walters reported that he took no medications and that there were no records of mental health treatment.  (R. 326).  Dr. Smith summarized the reports of Dr. Craig and Dr. Hansen at some length.  *Id.*  She also summarized Walters' reported activities of daily living.  *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Smith found that Walters was moderately limited in his ability to understand, remember, and carry out detailed instructions.  (R. 328).  Dr. Smith found that Walters was moderately limited in his ability to maintain attention and concentration for extended periods.  *Id.*  Dr. Smith also found Walters to be markedly limited in his ability to interact appropriately with the general public.  (R. 329).  She

---

[3] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

found no other significant limitations.  (R. 328-29).  Dr. Smith said that Walters could perform simple and some complex tasks, he could relate to others on a superficial work basis, he could not relate to the general public, and he could adapt to a work situation.  (R. 330).

Agency examining consultant Melanie Munn, M.D. completed an examination of Walters and a report dated May 12, 2007.  (R. 332-37).  Walters' chief complaints were seizure disorder, learning disorders, and psychological illnesses.  (R. 332).  Walters was 6'0" tall and weighed 306 pounds.  *Id.*  Dr. Munn's assessments were seizure disorder, not otherwise specified; learning disability; depression; and morbid obesity.  (R. 333).  The backsheet completed by Dr. Munn showed no problems with range of motion or pain.  (R. 335).

Walters saw Karl Youman, M.D. at the OU Physicians Psychiatry Clinic on April 14, 2008.  (R. 376-79).  For his assessments, Dr. Youman wanted to rule out personality disorder, not otherwise specified and learning disorder, not otherwise specified.  (R. 378).  He considered that Walters had major depressive disorder, recurrent, that was in full remission, and he also listed seizure disorder.  *Id.*  He assessed Walters' GAF as 75.  *Id.*

Walters saw Anees Afroze M.D. at the OU Physicians Internal Medicine Clinic on July 3, 2008 to establish care.  (R. 372-75).  Dr. Afroze's first impression was seizure disorder, and he continued Walters' Topamax and asked that Walters bring someone with him that had witnessed recent episodes for them to be evaluated.  (R. 374).  Dr. Afroze also started Fluoxetine to treat possible depression.  (R. 375).  Walters saw Joseph Palmeri M.D. at a follow-up appointment on August 21, 2008.  (R. 367-71).  Dr. Palmeri continued the Topamax for seizures and assessed obesity, not otherwise specified.  (R. 370).  He discussed dietary modifications with Walters.  *Id.* Dr. Palmeri referred Walters to psychiatry for evaluation of his sleep arousal disorder.  (R. 371).

Walters had a follow-up appointment with Dr. Palmeri on October 9, 2008.  (R. 362-66).

Dr. Palmeri noted that Walters had not accomplished any of the objectives established at the

August appointment, and he had a new complaint of migraines.  (R. 364).  Dr. Palmeri prescribed

naproxen for Walters' common migraine and prescribed a new medication for Walters' mild

hypercholesterolemia.  (R. 365).

Walters saw Maria Arquisola, M.D. at Family & Children's Services ("F&CS") on

February 27, 2009.  (R. 398-99).  Her impression on Axis I was depression, not otherwise

specified, and on Axis II personality disorder, not otherwise specified.  *Id.*  She assessed Walters'

GAF as 65.  (R. 399).  She started Walters on Seroquel.  *Id.*  Walters saw Kristy Griffith, M.D. at

a follow-up appointment on April 2, 2009, and he reported no improvement from the Seroquel.

(R. 400).  She assessed Walters with depression (296.32), seizure disorder, and insomnia.  *Id.*

She discontinued the Seroquel and added Celexa and Trazodone.  *Id.*  On June 22, 2009, Walters

reported that his mood had improved, and Dr. Griffith continued Walters' assessments and

medications.  (R. 403).

After the first hearing, the ALJ referred Walters for an additional psychological

evaluation, and this evaluation was conducted on April 21, 2009 by agency consultant Larry

Vaught, Ph.D.  (R. 380-90).  Dr. Vaught administered several tests and explained the results,

including the areas in which Walters had deficits.  (R. 381-85).  Dr. Vaught's diagnoses on Axis I

were dysthymic disorder and cognitive disorder, not otherwise specified.  (R. 385).  On Axis II,

he noted a mathematics disorder by history.  *Id.*  Dr. Vaught assessed Walters' GAF as 68.  (R.

386).

Dr. Vaught completed a Medical Source Statement of Ability to do Work-Related

Activities (Mental).  (R. 388-90).  On this form, he indicated that Walters' ability to understand,

remember, and carry out instructions was affected by his impairment.  (R. 388).  He said that

Walters had a mild impairment of his ability to understand, remember, and carry out simple

instructions or to make judgments on simple work-related decisions.  *Id.*  For complex

instructions or decisions, Dr. Vaught assessed a moderate limitation.  *Id.*  Dr. Vaught also said

that Walters' ability to interact appropriately with others, or to respond to work changes, would

be affected by his impairment.  (R. 389).  He said that Walters had a marked limitation in his

ability to interact appropriately with the public, and a moderate limitation in his ability to interact

appropriately with supervisors or coworkers.  *Id.*  He said that Walters had a mild impairment of

his ability to respond appropriately to usual work situations and to changes in a routine work

setting.  *Id.*  He said that no other capabilities were affected by Walters' impairment.  *Id.*

### Procedural History

Walters filed applications in December 2006 for Title II disability insurance benefits and

for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§

401 *et seq.*  (R. 187-97).  Walters alleged onset of disability as of October 15, 2006.  (R. 190).

The applications were denied initially and on reconsideration.  (R. 96-104, 108-113).  Hearings

before ALJ John Volz were held on January 26, 2009 and October 26, 2009.  (R. 21-83).  By

decision dated December 8, 2009, the ALJ found that Walters was not  disabled.  (R. 11-20).  On

July 29, 2011, the Appeals Council denied review of the ALJ's findings.  (R. 1-3).  Thus, the

decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. §§ 404.981,

416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Walters met insured status requirements through December 31, 2010. (R. 13).  At Step One, the ALJ found that Walters had not engaged in substantial gainful activity since his alleged onset date of October 15, 2006.  *Id.*  At Step Two, the ALJ found that Walters had severe impairments of obesity, major depressive disorder, ADHD, and borderline intellectual functioning.  *Id.*  At Step Three, the ALJ found that Walters' impairments did not meet any Listing.  (R. 14).

The ALJ determined that Walters had the RFC to perform light work with a marked limitation on his interaction with the general public.  (R. 15).  At Step Four, the ALJ found that Walters could perform his past relevant work as a dough mixer or a corn picker.  (R. 18).  As an alternative finding, at Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Walters could perform, considering his age, education, work experience, and RFC.  *Id.*  Thus, the ALJ found that Walters was not disabled from October 15, 2006 through the date of the decision.  (R. 20).

## Review

Walters argues that the ALJ failed to properly consider the opinion evidence of Dr. Hansen, Dr. Craig, and Dr. Vaught, all of whom were examining physicians, and Dr. Smith, who was an agency nonexamining consultant.  The Court agrees with Walters that the ALJ did not sufficiently explain why the ALJ did not incorporate all of the limitations found by these four doctors in his RFC determination, and therefore reversal is required to allow the ALJ to make this explanation.  Because reversal is required on this issue, the other issues raised by Walters are not considered.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive."  20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source about issues reserved to the Commissioner must never be ignored.").  An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection.  *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished), *citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003).  If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted.  *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

The Court agrees with Walters that the ALJ erred by failing to include in his RFC determination limitations found by the examining and nonexamining consultants. *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007). The claimant in *Haga* had numerous physical and mental impairments, and the ALJ had included nonexertional restrictions in his RFC determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact with the public," and "no requirement for making change." *Id.* at 1207. A consultant had completed an RFC form indicating that the claimant was moderately impaired in seven functional categories. *Id.* The claimant argued that the ALJ had implicitly rejected the consultant's opinion by failing to include any accommodations in his RFC determination that addressed the consultant's assessment that the claimant had moderate difficulty in her ability to deal appropriately with supervisors and coworkers and to respond appropriately to workplace pressures and changes. The ALJ had given no explanation relating to why he did not address some of the consultant's findings of moderate restrictions while including others, and the Tenth Circuit agreed that this omission required reversal so that the ALJ could explain the evidentiary support for his RFC determination. *Id.* at 1207-08.

Here, the opinion evidence of the four physicians was remarkably consistent in finding that Walters had limitations in the areas of concentration and attention. In 2004, Dr. Hansen found that tests indicated a "clinically significant attentional problem exists." (R. 294). In 2007, Dr. Craig said that Walters' "ability to work is severely impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, and socially interacting with coworkers or public." (R. 309). Dr. Smith, the nonexamining consultant, found that Walters was moderately limited in his ability to understand, remember, and carry out detailed instructions and in his ability to maintain attention and concentration for extended

periods.  (R. 328).  Dr. Vaught, who did additional testing at the ALJ's request after the first

hearing, said that Walters had a mild impairment of his ability to understand, remember, and

carry out simple instructions, but had a moderate impairment as to detailed instructions.  (R.

388).

Thus, these three examining and one nonexamining physicians consistently found that

Walters had at least mild and perhaps moderate-to-severe problems in the area of focus and

concentration and that this would translate into problems understanding and following directions.

The ALJ, generally, did an adequate job in discussing the opinions of these consultants.  (R. 16-

18).  The ALJ, however, did not include any reference to these limitations in his RFC

determination, which only included a "marked limitation on [Walters'] interaction with the

general public."  (R. 15).  The ALJ gave no explanation for why he omitted any reference to

limitations of Walters' ability to concentrate or to follow instructions.  He stated that Walters'

success at Tulsa Community College showed a "capacity to perform at least simple instructions

in a job on a consistent basis."  (R. 17-18).  Regarding interpersonal conflicts, the ALJ briefly

reviewed the evidence, and then stated the following: "The undersigned does not accept that the

claimant's behavior is organic and beyond his control.  Rather, it is behavior he has allowed

himself to slide into and that he could correct with determination and counseling."  (R. 18).

It appears to the undersigned that the quoted language was intended only to convey that

the ALJ rejected any claims regarding interpersonal conflicts beyond the marked limitation for

public contact that he included in his RFC determination.  If the ALJ intended it as an

explanation for why he included no limitations regarding Walters' ability to understand and carry

out instructions, that is not clear and is not sufficient pursuant to *Haga*.  Especially here, where

there was opinion evidence from four different sources that was relatively consistent, the ALJ

needed to give a legitimate explanation for the omission of any limitation regarding concentration and ability to follow instructions.  *Haga*, 482 F.3d at 1208.

The Commissioner argues that someone with limitations of concentration, focus, and ability to carry out instructions could perform the jobs identified by the vocational expert (the "VE") because the majority of those jobs were unskilled.  Response Brief, Dkt. #15, pp 7-8. This may be true, but the Court cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Henderson v. Astrue*, 383 Fed. Appx. 700, 702 (10th Cir. 2010) (unreported)*, quoting Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005) (further citation omitted).  The undersigned will not decide what the VE would have testified had the ALJ included in his RFC determination all of the limitations supported by the evidence of the three examining and one nonexamining physicians.  To do so would be to usurp "the administrative tribunal's responsibility to find the facts."  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

This Court takes no position on the merits of Walters' disability claim, and "[no] particular result" is ordered on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the

Commissioner denying disability benefits to Claimant for further proceedings consistent with this

Order.

Dated this 11th day of January 2013.

Paul J. Cleary
United States Magistrate Judge